# Bole *v.* Murray, Appellant.

*Corporations—Subscription to stock—Payment in property—Burden of proof—Evidence—Cross bill—Equity.*

1. Where an original subscriber to the stock of a corporation claims to have paid his subscription in something else than money, the burden is on him to show a contract with the corporation permitting it, and the further burden is on him to show that the transaction was fair, and that the property turned over in payment had been valued by those representing the corporation in good faith.

2. Where a subscription to stock is made prior to the incorporation of a company, the subscriber cannot maintain that the certificate issued to him after incorporation was paid in property where the evidence shows that the property transferred was of little utility, that the directors had never passed upon its value, and had never taken any corporate action in reference to the issuance of the certificate or payment therefor in property.

3. Stock subscribed for after a corporation is organized will be deemed to have been paid for in full where the evidence shows a part payment in cash, and the remainder in an assumption by the subscriber of a debt due by the corporation to a third party.

4. On a bill in equity filed against a subscriber to the stock of a corporation to recover the amount of his stock subscription, where the defendant sets up payment of the subscription by the transfer of property to the company, the court commits no error in dismissing a cross bill which does not ask for affirmative relief, but merely for a decree determining how much would be due and owing from the company to the defendant on an open account in the event that the finding on the plaintiff's bill should be adverse to the defendant.

Argued Oct. 16, 1911. Appeal, No. 3, Oct. T., 1911, by defendant, W. N. Murray, from decree of C. P. No. 2, Allegheny Co., April T., 1908, No. 1,068, on bill in equity in case of George M. Bole, Receiver et al., v. The Belden

Automobile Transmission Company et al. and W. N. Murray. Before Fell, C. J., Brown, Mestrezat, Potter, Elkin and Stewart, JJ. Decree modified.

Bill in equity to recover a stock subscription.

From the record it appeared that W. N. Murray subscribed to seventy-five shares of the stock of the Belden Automobile Transmission Company prior to its incorporation, and ten shares of the stock subsequent to its incorporation. Murray claimed that the seventy-five shares had been paid in full by property transferred to the company.

Haymaker, J., filed an opinion which was in part as follows:

It appears that for some time prior to the incorporation of this company, Mr. Murray was president of the Standard Automobile Company of Pittsburg. Something like one year before this incorporation, E. H. Belden, the original promoter of this scheme, with Mr. Murray secured certain patents for an invention in the equipment of automobiles with certain appliances relating to the transmission of power, etc., which was called the "Belden Transmission," and this company was incorporated as the "Belden Automobile Transmission Company," for the purpose of manufacturing these appliances and all the materials, machinery, or equipment connected therewith, with the ultimate view of having the owners of automobiles install this transmission in their machines. Murray and Belden had been experimenting with this new system of power for more than a year before this incorporation, during which time Mr. Murray had expended over $4,000, in securing various patents, and in advancing cash to Belden in connection with experimental work and on his personal account. This new system of power transmission as it is called, was installed originally in an automobile furnished by Mr. Murray, and the experiments were made with his car in 1904. When it was thought that

this transmission was perfected, Belden organized the company, Mr. Murray turned over the car to the company, and was given these seventy-five shares for the moneys he had expended before the incorporation, as we have stated, and the automobile so turned over to the company. There was no evidence that the board of directors authorized this arrangement, or that it was agreed to or known by all the stockholders. There is little doubt that if this cash and property constitutes a legal payment, Mr. Murray has paid the amount of his liability on his subscription for the seventy-five shares. The ten shares were subscribed for after the incorporation, and he claims that these were in part paid by a contra-account of the Standard Automobile Company against the corporation, which the automobile company, after crediting the corporation, charged the same against him personally, amounting to between $600 and $700. He claims that he paid some cash, but was unable to give any very definite amount, but it approximates $250, and he should be allowed a credit for that amount. The books of the corporation credit him with payment of the ten shares.

If this were an attempt on the part of the corporation to compel Mr. Murray to pay these subscriptions a more serious question would be presented, but we have here a creditors' bill, and as against an unconditional and unqualified subscription, which gives no notice to either creditors or stockholders of this secret arrangement, he sets up the defense that he was not to pay for these seventy-five shares because he had expended money and property an equivalent of this indebtedness, in experimenting before incorporation on a device or system of power, which would appear from the evidence in this case to have been of little utility. There was not even corporate action, by resolution or otherwise, authorizing the issuance of these seventy-five shares on the terms set up by Mr. Murray.

Assuming that Mr. Murray expended large sums of money, and used certain property of his own, experimenting on patents preparatory to the organization of this

corporation, certainly this expenditure, made about one year before the organization, was not the kind of money and property for which the corporation could issue full-paid stock, not liable to any future call. There was no evidence that the board of directors ever passed judgment on the value of this expenditure on the part of Mr. Murray, or endeavored to ascertain in any official way whether or not such an expenditure was actually made, or what relation it bore in value to the stock issued therefor.

In Wetherbee v. Baker, 35 N. J. Eq. 501, it was said: "The capital stock subscribed is a substitute for the personal liability of partners in ordinary copartnerships, and creditors are entitled to a bona fide exercise of the compulsory powers of the corporation to compel subscribers to pay in their subscriptions. Any arrangement between the agents of the corporation and the subscribers for its stock that their subscriptions shall be merely colorable, or less onerous than they purport to be on the face of the subscription is void and a fraud upon creditors.

"The subscription to the capital stock constitutes a trust fund for the payment of its debts. The officers and managers of the corporation are trustees of the fund. They cannot squander it or dispose of it to the prejudice of creditors without an equivalent consideration, and the trust cannot be defeated by any simulated payment of the stock subscription, or by any device short of actual payment in good faith."

We are of the opinion that the defendant is liable, and should be required to pay whatever is unpaid on the contract of subscription, or such sums on account thereof as may be necessary to pay the debts of the several plaintiffs.

Subsequent to the filing of the above opinion Murray filed a cross bill.

HAYMAKER, J., struck off the bill, filing an opinion which was in part as follows:

After we had overruled the exceptions of Murray to our

findings and conclusions, and the plaintiffs had submitted a form of decree Murray filed his cross bill praying that he be adjudged and decreed a creditor of the corporation in the sum of $8,424.25, with interest, being the amount of cash and property alleged to have been contributed and paid, so that he might be allowed to participate in the distribution of the funds realized by the plaintiffs; that whatever distribution of this fund is made on account of his claim should be credited upon the balance of his subscription to the capital stock, and further, that all proceedings against him be stayed pending the disposition of his cross bill.

As we have said the original bill was filed March 28, 1908, and for more than two years Murray resisted the plaintiff's bill on the sole ground that his stock was fully paid, and it was only after proceedings were concluded, and we found against him that he filed his cross bill in which he claims to be a creditor entitled to participate in the distribution of a fund realized by the efforts of plaintiffs. There is nothing in the cross bill to indicate that he has any thought of abandoning his original position, or submitting to our decree, and he now assumes the attitude of a party claiming that the same money and property that paid for his stock can be used as the basis of a claim as creditor against the corporation. This is in conflict with his answer, which, as was said in Graham v. Thankersley, 15 Ala. 634, must be considered true as against himself and destroys the equity he asserts in his cross bill. We see no equity in a cross bill that undertakes to maintain these two inconsistent positions, and for that alone we believe we would be justified in striking it off; but the plaintiffs also claim that it should be stricken off because it was improvidently filed, and without leave of court. The plaintiff in the cross bill neither obtained leave of court, nor offered any excuse for the delay in filing it. In Braman v. Wilkinson, 3 Barb. 151, the court said: "The proper time for filing a cross bill is before a replication is filed to the answer of the defendant to the

original bill. If a cross bill is filed after issue is joined in the original cause, proceedings will only be stayed upon the cross bill."

In Irving v. DeKay, 10 Paige's Ch. Reps. 319, the chancellor said: "If the cross bill in this case showed a case of equitable set-off, which it was impossible for the defendants to avail themselves of by a proper answer in the original suit, they were not entitled to an order to stay the proceedings without showing some excuse for their neglect to file their cross bill before this suit was at issue.

"The proper time to file a cross bill . . . . is at the time of putting in the answer to the original bill, and before the issue is joined, by the filing of the replication."

To the same effect are the cases of Roberts v. Peavey, 29 N. H. 392; Gouverneur v. Elmendorf, 4 Johnson's Ch. Reps. 357, and many others that might be cited. We are of the opinion that the plaintiff in this cross bill has not alleged such statement of facts as entitles him to the relief for which he prays, and that the cross bill was improperly filed and should be, and now is, stricken off and dismissed.

*Errors assigned* were the various findings of fact, conclusions of law and in dismissing the cross bill.

*Harvey A. Miller,* for appellant.—The court found the stock was in fact issued for this property and we, therefore, submit in the words of the act, "The judgment of the directors as to the value of the property purchased shall be conclusive:" Donald v. American Smelting & Refining Co., 62 N. J. Eq. 729 (48 Atl. Repr. 771, 1116); Donald v. American Smelting & Refining Co., 61 N. J. Eq. 458 (48 Atl. Repr. 786); Bickley v. Schlag, 46 N. J. Eq. 533 (20 Atl. Repr. 250); Edgerton v. Electric Imp. & Const. Co., 50 N. J. Eq. 354 (24 Atl. Repr. 540); Flaherty v. Atlantic Lumber Co., 58 N. J. Eq. 467 (44 Atl. Repr. 186); Clevenger v. Moore, 71 N. J. Law, 148 (58 Atl. Repr. 88); Pitts-

burg & Connellsville R. R. Co. v. Stewart, 41 Pa. 54; Carr v. LeFevre, 27 Pa. 413.

The cross bill was properly filed: Bickley v. Schlag, 46 N. J. Eq. 533 (20 Atl. Repr. 250); McCune v. Lytle, 197 Pa. 404; Paxton v. Stackhouse, 4 Kulp, 403; Springfield Milling Co. v. Mfg. Co., 81 Fed. Repr. 261; Freeland v. Oil Co., 189 Pa. 54; Datz v. Phillips, 137 Pa. 203; Graham v. Thankersley, 15 Ala. 634.

*Charles F. Patterson*, with him *Shiras & Dickey, R. B. Wolf* and *Weil & Thorp*, for appellees.

OPINION BY MR. JUSTICE STEWART, January 2, 1912:

We may concede that a corporation, once it has been formed and is actually being operated, may accept in payment of an original and unconditioned stock certificate its fair equivalent in property or services. Indeed, so much was expressly decided by this court in Shannon v. Stevenson, 173 Pa. 419, where it was said: "There is no inherent incapacity of a corporation to purchase property or labor and pay for it by stock instead of money. If the corporation here had paid the defendant $1,000, in cash, to leave his former position and undertake his presidency, on condition that he invest the money in its stock, there could be no question of the validity of the transaction, and yet it would in substance have been exactly the same." This was said in a case where, as here, the action was by the receiver of an insolvent corporation to recover an unpaid original subscription, and the defense set up was that the corporation had accepted payment in service rendered. Other authorities equally explicit on the point could readily be cited. The defense here relied on, as to the first subscription of seventy-five shares, was not that the original subscription was a conditional one as to the terms of payment, but that the defendant had turned over to the corporation, after it had been organized, an automobile for which he had paid $2,800, and on which, for the purpose of illustrating and demonstrating the usefulness

and adaptability of certain appliances in connection with motor cars for the manufacture of which the corporation was formed, he had expended a sum of money, which, added to the original cost of the automobile, made a sum equal to his first subscription for seventy-five shares. As to the ten additional shares he subsequently subscribed for after the incorporation, he claimed that he had paid for these by a cash payment of $250, and by a contra account of the Standard Automobile Company against the corporation, whose stock he had subscribed for, which, after being credited to the corporation was charged against the defendant on the books of the Standard Automobile Company, amounting to about $700. The defendant is credited on the books of the corporation with the payment of these ten shares. The two subscriptions evidently stand with respect to payment on different footing; the claim as to the seventy-five shares is that it was paid for in property; as to the ten shares, that these were paid for in cash or its equivalent in credit. The answer to the bill contains no averment that the certificate for the seventy-five shares subscribed was issued to the defendant in payment for the property turned over by him, or that the value of the property so turned over was the equivalent of the stock; or that there was any understanding or agreement between himself and the corporation that the property was to be received in payment. For all that appears in the answer, what was set up by way of defense was merely a set-off of indebtedness due the defendant from the corporation for the property he had turned over. Its insufficiency is quite apparent, nevertheless, the taking of testimony was entered upon. What the evidence disclosed can only be gathered from the chancellor's finding. These not having been excepted to, it was agreed between counsel that the evidence might be omitted from the paper-book, and the case be heard on the findings. It is quite enough to know that none of the findings supplement the defendant's answer with respect to the serious omissions above referred to. On the contrary, we have

definite and distinct findings that the issuing of the certificate for the seventy-five shares in defendant's name was not pursuant to any corporate action; that there was no evidence that the directors of the corporation ever passed judgment on the value of the property defendant claims to have turned over in payment, or what the actual value of the property was. There is the further finding that the property was of little utility. Since the case rests on the findings of the court, what of itself is sufficient to defeat the defendant's attempt to escape liability on the ground set up, without going further, is the fact that there is no finding that the payment for the stock in property was ever the subject of contract or agreement between the defendant and the corporation. Except as there was such contract defendant stands with respect to the property he turned over in the same situation as any other creditor of the concern. The fact that there is no finding of a contract is an equivalent in this proceeding of a finding that there was no contract. In all such cases where an original subscriber to stock claims to have paid a subscription in something else than money, the burden is on him to show a contract with the corporation permitting it, and the further burden is on him of showing that the transaction was fair and that the property turned over in payment had been valued by those representing the corporation in good faith. None of these things here appear, and it follows that defendant's liability for his subscription to seventy-five shares remains, and that he was properly charged therewith.

We are of the opinion that the court overlooked a clear distinction between the original subscription for seventy-five shares and the later one for ten shares, made after the corporation was a going concern. This latter subscription was made after the corporation had been organized for fully seven months. There is nothing in the specific findings which distinguishes these subscriptions, but in the discussion of the facts by the chancellor the distinction clearly appears, from the following extract: "The ten

shares were subscribed for after the incorporation, and he claims that these were in part paid by a contra account of the Standard Automobile Company against the corporation, which the automobile company, after crediting the corporation, charged the same against him personally, amounting to between $600 and $700. He claims that he paid some cash but was unable to give any very definite amount, but it approximates $250 and he should be allowed a credit for that amount. The books of the corporation credit him with the payment of the ten shares." It would have been much more satisfactory had there been specific finding with respect to what is here set out, but from the chancellor's discussion we take the facts as stated in the above extract as having been satisfactorily established; that the corporation now represented by the receiver was indebted to another corporation between $600 and $700; that this indebtedness the defendant individually assumed and the plaintiff company was discharged from liability on account thereof; that the difference between the credit and the amount of the stock subscription the defendant paid in cash, and that the books of the plaintiff company show payment in full of this particular subscription. If it occurred in this way, how was it other than a cash payment? It was not property that was turned over. It would have been substantially the same had the indebtedness of the plaintiff company been owed directly to the defendant and the stock subscription had been paid by giving the credit. There is no suggestion of fraud in connection with this transaction. So far as appears it was strictly bona fide, and it sufficiently appears from the books of the company that the transaction was closed on this basis. We are of opinion that it was a mistake to treat the subscription for the ten shares as unpaid.

The cross bill filed by the defendant was properly dismissed. What was asked for was not affirmative relief, but a decree determining how much was due and owing from the insolvent company to the defendant on an open account, in the event the finding on the plaintiff's bill

was adverse to the defendant. With respect to that indebtedness, if there be any, defendant stands towards the corporation in no better position than any other creditor. The decree should be so far modified as to exempt the defendant from liability for the ten shares of stock above referred to, thereby reducing the amount for which the defendant is liable from $8,500 to $7,500. And as so modified the decree is affirmed, and the appeal is dismissed, the costs on the appeal to be paid by appellee.